Filed 10/15/14  P. v. Rasberry CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B249073 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA389670) |
| v. | |
| EDWARD RASBERRY et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig Mitchell, Judge.  Affirmed as modified.

Jerome McGuire, under appointment by the Court of Appeal, for Defendant and Appellant Edward Rasberry.

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant Darnell McMillian.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General for Plaintiff and Respondent.

_____

Appellants Edward Rasberry and Darnell McMillian were convicted, following a jury trial, of one count of second degree robbery in violation of Penal Code[1] section 211, one count of carjacking in violation of section 215 and one count of assault with a firearm in violation of section 243, subdivision (a)(3). Appellant Rasberry was also convicted of being a felon in possession of a firearm in violation of section 12021, subdivision (a)(1). In a bifurcated proceeding, the jury deadlocked on the allegation that appellants committed the crimes for the benefit of a criminal street gang within the meaning of section 186.22. This was the second trial of this matter. The jury in the first trial was unable to reach a verdict.

The trial court found true the allegation that Rasberry had suffered two prior convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i); 1170.12) and sentenced him under that law. The court sentenced Rasberry to three consecutive terms of 45 years to life for the robbery, carjacking and assault convictions. The court stayed sentence on the firearm possession conviction. The court sentenced McMillian to a total of 19 years in state prison, consisting of the upper term of nine years for the carjacking conviction plus a 10-year term pursuant to section 12022.53, subdivision (b). The court imposed concurrent terms for the other convictions.

Appellants appeal from the judgment of conviction. We affirm.

Facts

On September 8, 2011, Davon Williams drove his friend Kevin Chima home. Williams had about $5000 in a case with him, as he intended to buy a new car. Unbeknownst to Williams, Chima exchanged text messages with Rasberry before and during the drive. In these messages, Chima informed Rasberry that Williams had about $4500 in cash with him and kept Rasberry advised of the car's whereabouts. Rasberry mentioned that he had "Poppa T" with him. Appellant McMillian's nickname is "Poppa

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

Toast." Near the end of the exchange, Chima advised Rasberry, "We about to pull up rite now" and "On rollin down da st rite now."

When Williams pulled into Chima's driveway, two men approached the car. Williams later identified the men as appellants Rasberry and McMillian. Rasberry pointed a gun at Williams and told him to hand over everything. Williams handed over about $200 in cash from his pocket and his earrings. Rasberry hit Williams in the head with his gun. He asked Williams where the money was. McMillian rummaged through Williams's car. Rasberry said, "Fuck it, Cuz, let's take the car, just take the car." Appellants got into Williams's car and drove away.

Williams and Chima went across the street to Brianna Reed's house. Chima told her to call the police, and she did so. Williams left in another car to look for his car.

While Williams was gone, Los Angeles Police Officer Brian Frieson arrived. Reed told him that Williams had been robbed by two Black men carrying guns. Williams returned and told Officer Frieson that he believed one of the robbers was a member of the Five-Deuce Broadway Gangster Crips gang. Williams described the robber who hit him as six feet tall, weighing around 250 pounds and about 35 years old. The other robber was 5'8" tall, weighed about 170 pounds and was about 20 to 23 years old.

On September 11, 2011, Los Angeles Police Officer Christopher Dean stopped Williams's stolen Buick. Monrow Ham and Jim Grayson were in the car. Ham later told Detective Gerry Chamberlain that he got the car from Rasberry.

On September 12, 2011, Los Angeles Police Detective Gerry Chamberlain met with Williams at the 77th Precinct. During their interview, Williams told Chamberlain that one of the robbers was "Bo" who had a relationship with Roxanne Armstrong, Williams's "auntie." "Bo" is one of Rasberry's nicknames. This information was not in the initial police report about the crimes.

Chamberlain showed Williams six-pack photographic line-ups containing photos of Ham and Grayson. Williams did not identify anyone in those line-ups. Chamberlain showed Williams additional six-pack photographic line-ups. He identified appellant

McMillian in one. Williams was not shown a line-up containing Rasberry's photo at that time.

On September 28, 2012, Williams selected Rasberry from a photographic line-up. Rasberry is about 5'5" or 5'6" and weighed about 200 pounds.

On October 5, 2011, Los Angeles Police Officer Heriberto Lopez conducted a traffic stop on a vehicle being driven by Rasberry. Rasberry was wearing earrings that were similar to Williams's stolen earring. Two cell phones were found in the car. One cell phone contained the text messages from Chima.

On October 18, 2011, Williams spoke with Los Angeles Police Detective Trevor Larsen. Williams told Larsen that he had received a telephone call from a woman identifying herself as Rasberry's sister. She told him that if he did not go to court or testify, he would get $1500 and his earrings back. Williams also told Larsen that two unfamiliar people came to his house, asked for him by his nickname ("Day-Day") and said "Day-Day don't come to court." In addition, Williams stated that one of his friends had recently been murdered and people had told Williams that he was the intended target. Williams believed it was because of his involvement in this case.

Williams became progressively less cooperative with police after receiving the threats. He eventually recanted his identification of appellants. At the time of trial, he was in custody for refusing to comply with the prosecution's subpoena. On the stand, Williams testified that he was not afraid of retaliation for testifying. He stated that he did not believe gangs retaliated against witnesses.

The prosecution presented evidence that appellants were gang members. The prosecution's gang expert testified that it is part of gang culture to retaliate against witnesses who testify against gang members.

In his defense, Rasberry presented the testimony of Roxanne Armstrong. She testified that she had been a close family friend of Williams since he was 13 years old. She acknowledged that Williams had met Rasberry at her house. Armstrong was Rasberry's girlfriend.

On September 8, 2011, Williams called Armstrong and told her he had been robbed. Rasberry was with Williams at the time. Armstrong went and spoke with Williams. He did not mention that Rasberry was one of the people who robbed him.

Discussion

1. Detective Chamberlain's testimony

Rasberry contends the trial court improperly and prejudicially allowed Detective Chamberlain to testify that "he knew with 100% certainty that defendants were guilty in cases where the victim's description of the perpetrator did not match the defendant" and "compounded" the error by allowing the detective to "essentially give pseudo expert psychological testimony that trauma often causes crime victims to erroneously describe the perpetrator." McMillian joins in this contention. There was no impropriety in the detective's testimony.

The testimony identified by appellant occurred on redirect examination of the detective. "It is well settled that when a witness is questioned on cross-examination as to matters relevant to the subject of direct examination but not elicited on that examination, he may be examined on redirect as to such new matter." (*People v. Steele* (2002) 27 Cal.4th 1230, 1247-1248.) Further, "[r]edirect examination's 'principal purposes are to explain or rebut adverse testimony or inferences developed on cross-examination, and to rehabilitate a witness whose credibility has been impeached.' [Citations.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)

Here, on cross-examination, defense counsel asked Chamberlain if he asked Williams why he did not tell police that the robber was his auntie's boyfriend. Chamberlain replied that he did not recall if he asked the question. Defense counsel then asked, "isn't that a logical question to ask when you're doing a follow-up to this case?" Chamberlain replied that in his experience, victims of violent crimes "tend not to remember things that are vital to the investigation. Therefore I would do a follow-up investigation or interview with them where they might remember things more clearly under a controlled environment."

Defense counsel then asked, "So let me see if I understand what you're saying. You're saying that you believe that Mr. Williams forgot it was his auntie's boyfriend when he first told the police officer?" Chamberlain replied, "I don't know what his mindset was, sir. I know, in my professional experience, victims tend to forget certain things during their initial reporting to the reporting officers. So I try to follow up with them to get more information from that individual." Defense counsel then asked, "But I'm saying it's not the same thing as he may have forgotten whether it was blue or brown, the shirt. I mean, this was something he had personal knowledge of the person who robbed him even before he got robbed. Isn't that significant to you?"

Shortly thereafter, defense counsel asked Chamberlain, in effect, what his reaction was when he realized that although suspect number one was described as being six feet tall, Rasberry was only 5'5" or 5'6". Counsel asked, "When you saw him, you said to yourself, that's ridiculous . . . ; correct? That's not even close." Chamberlain replied, "I didn't say that's ridiculous. I just noticed that he wasn't 6 foot tall."

These questions were an attack on Chamberlain's investigative technique in this case, and also his credibility. On redirect, the prosecutor asked follow-up questions in these two areas to rehabilitate Chamberlain.

In response to questions from the prosecutor about the disparity between Williams's description and Rasberry's actual appearance, Chamberlain explained that he had encountered such disparities before. He testified that over the course of his 13-year career there had been "several occasions" when a victim's initial description did not match the actual physical appearance of a suspect but Chamberlain knew "because [the suspect] – I don't know – confesses or whatnot, you know 100 percent that's the person that committed the crime[.]" Thus, Chamberlain did not find Williams's inaccurate description "ridiculous."

Chamberlain's testimony did not amount to expert testimony on eyewitness identification. Chamberlain was describing his personal experience in dealing with victims of violent crimes in past cases to explain his investigation in this case. Even if

6

this were construed as expert testimony, it would be expert testimony about police investigative techniques, a topic on which Chamberlain was qualified to opine.

Nothing in Chamberlain's testimony suggests he was an expert in "determining a defendant's guilt." The prosecutor's question was limited to questions where virtually everyone would agree the defendant was guilty, such as when he confesses. Nothing in the question or answer suggested that Chamberlain had some special ability to determine guilt.

Once it was established that Chamberlain had knowledge of some cases where the victim incorrectly described the actual perpetrator of the crime, Chamberlain was asked if there were any similarities among the victims who misdescribed "guilty" suspects. He replied, "Whether or not they sustained any injuries, sometimes that could affect their recollection at that immediate time. Trauma to a person can actually affect their memory in certain ways in my experience in dealing with victims."

Even if this testimony were construed as unqualified expert testimony on eyewitness identification, Chamberlain had already given similar testimony on cross-examination. He had explained that in his experience victims of "violent crime, they tend not to remember things that are vital to the investigation." Chamberlain's redirect testimony was simply further discussion of a topic already introduced during cross-examination. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 643-644 [cross-examination by the defendant may open the door for admission of evidence on redirect examination that is favorable to the prosecution and which may not have been admissible in the prosecution's case-in-chief].)

2. Jailhouse telephone call recording

Rasberry contends the trial court erred in denying his motion for a mistrial, made after the prosecution inadvertently played a portion of a recording of a phone call in which appellant stated, "You know, I'm looking at life." He claims the reference was incurably prejudicial and denied him a fair trial.

7

In denying Rasberry's motion, the trial court ruled as follows: "The court is disinclined to grant [Rasberry's] motion for a mistrial. As I have indicated, I have listened carefully now two times to the portion that should not have been played. There is some static or some other sounds being superimposes on the first part of the inappropriate or intended redacted portion that blurs its clarity slightly. [¶] It is also certainly not referenced in the transcript. I am also mindful of the fact that they are repeatedly admonished not to consider punishment for any purposes - - or for any purpose. [¶] And that is why the court respectfully declines to grant a motion for mistrial."

A jury must not consider punishment in determining whether or not a defendant is guilty of a charged offense. (See *People v. Thomas* (2011) 51 Cal.4th 449, 486; *People v. Alvarez* (1996) 49 Cal.App.4th 679, 687.)

The possible harm or benefit to a defendant from a jury's consideration of penalty depends on the circumstances of the case. For example, in a case where a defendant is charged with a minor crime such as drug possession but faces a lengthy sentence due to prior convictions, a defendant might want the jury to know that he is facing a long sentence in the hope of jury nullification. (*People v. Nichols* (1997) 54 Cal.App.4th 21, 24.) When a defendant is charged with murder with special circumstance allegation, the defendant would not want the jury to know that he could be paroled if the special circumstance allegation was found not true because he might fear that the jury would find true the special circumstances allegation without proper consideration of the evidence in order to make sure that the defendant was never let out of prison. (See *People v. Thomas, supra*, 51 Cal.4th at p. 486.)

Rasberry contends that in some cases where the charged crimes are minor but the defendant faces a life sentence, the jury would recognize that a defendant faces the life term because he has prior serious convictions, and would treat the prior convictions as evidence that he was prone to commit crimes, including the charged offense. Rasberry relies on *People v. Thompson* (1988) 27 Cal.3d 303 to support this argument. His reliance is misplaced. That case discusses the introduction of evidence at trial of prior

8

uncharged crimes. It says nothing about evidence of punishment. There is no reason to believe that the jury in this case was familiar with criminal sentencing law, knew that none of the charges carried a life sentence and believed that Rasberry's reference to life meant that Rasberry had suffered prior serious or violent felony convictions.

More importantly, the trial court in this matter instructed the jury not to consider punishment in determining guilt. The jury is presumed to have understood and followed this instruction, even in cases more serious than the present one. (See *People v. Thomas*, *supra*, 51 Cal.4th at p. 487 ["We also presume[] that the jury follow[s] the court's instruction not to consider penalty or punishment in determining the defendant's guilt"].) Rasberry was not denied a fair trial.

### 3. Williams's testimony about his friend's murder

Rasberry contends the trial court erred prejudicially in admitting testimony that Williams's friend Charles was killed at a party Williams attended but Williams believed he was the intended target of the killing. Rasberry contends the testimony appears to have been fabricated, was more prejudicial than probative and was not "necessary" to the prosecution's case. McMillian joins in these contentions. We see no error.

As appellants acknowledge, threats against a witness are relevant to the witness's credibility. (*People v. Warren* (1988) 45 Cal.3d 471, 481; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1367-1368.) Evidence of an out-of-court threat made against a witness is not hearsay when offered to prove the effect of the statement on the witness or to explain differences between the witness's current testimony and prior statements. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162; *People v. Burgener* (2003) 29 Cal.4th 833, 869.)[2]

---

[2] Such statements are inadmissible hearsay if offered to prove truth of their contents. Here, the jury was instructed that the out-of-court statements about Charles's murder were not being offered to show the truth of the statements. They were being offered "to simply show the impact of those statements on Mr. Williams."

9

Appellants contend that Williams's statement was not relevant and admissible because the circumstances of Charles's murder did not "substantiate or corroborate" Williams's claim that he believed he was the target of the shooting. Specifically, appellant contends that the shooter could have killed Williams during a fight which occurred while Williams and Charles were outside at the party but did not, Charles was not targeted but was killed "in or around" a second fight which occurred after Williams went inside, and there is no evidence that the shooter mistook Charles for Williams.

There is nothing inherently suspect about the manner of Charles's killing. There could be many possible reasons the shooting did not occur until the second fight, the most obvious one being that the shooter did not arrive until then. Williams did not claim that the circumstances of the shooting somehow showed that he was the target. He stated that he had heard from "a lot of people" that he was the intended target. It was for the jury to decide the credibility of Williams's claims.

Appellants contend that even if Williams's statement was believable, it was prejudicial and not necessary. As with all threats, there is some potential prejudice. The jury was instructed that the statement was not admitted to show that it was true, that is to show that someone had actually tried to kill Williams, but only to show the impact on Williams of hearing from others that he was the intended target. The court specifically instructed the jury to tell the court if it had difficulty with that distinction. Thus, the potential prejudice of the statement was minimal.

Evidence of Williams's belief that he was the intended murder target was necessary to the prosecution's case because Williams dramatically altered his account of the crimes in this matter. While there was evidence that people had come to Williams's house and told him not to go to court, those threats were vague at best. Statements that Williams was the intended target of a murder was a much more serious threat, and were much more likely to have influenced Williams.

4. Chima's testimony

Appellant contends the trial court erred prejudicially in allowing the prosecution to call Kevin Chima as a witness because the court knew Chima would refuse to speak and in instructing the jury that it could draw a negative inference from Chima's refusal to speak.[3] Chima was a defendant in this matter. Before trial, he entered a guilty plea and as part of his plea agreement waived his appellate rights.

It is improper for the court to require that a witness be put on the stand to claim a Fifth Amendment privilege in the presence of the jury "when it has already been determined he will refuse to testify." (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554; see *People v. Mincey* (1992) 2 Cal.4th 408, 440-442.) However, there is no such prohibition when a witness "has no constitutional or statutory right to refuse to testify" but nevertheless attempts to invoke the privilege. (*People v. Lopez, supra*, 71 Cal.App.4th at pp. 1554-1555.) Further, when a witness with no privilege refuses to testify, jurors are entitled to draw a negative inference when the witness's refusal to provide relevant testimony. (*Ibid.*)

"'When a defendant has already pled guilty to a charge, and time to appeal the conviction has run without an appeal being filed, the defendant's privilege to avoid compelled self-incrimination with regards to the facts underlying the conviction no longer exists.'" (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 151, quoting *People v. Lopez, supra*, 71 Cal.App.4th at p. 1554.)

Although Chima waived his right to appeal, the time for filing an appeal had not yet run. Chima's court-appointed duty lawyer pointed to *People v. Orozco* (2010) 180 Cal.App.4th 1279, which holds that a defendant cannot waive his right to appeal on the ground that he received ineffective assistance of counsel in connection with his plea, including any waiver of his appellate rights. (*Id.* at pp. 1283-1284.) Counsel argued that

---

[3]     The parties all assume that Chima was attempting to invoke his privilege against self-incrimination. We note that Chima was almost entirely silent and it is not entirely clear from the record before us whether he was in fact attempting to invoke his privilege against self-incrimination.

11

Chima still retained his right against self-incrimination, since a successful appeal could result in undoing the plea bargain. Counsel did not represent that Chima intended to file such an appeal.

We will assume for the sake of argument that the trial court erred in finding that Chima no longer had a privilege against self-incrimination, in putting Chima on the stand and in permitting the jury to make a negative inference from Chima's refusal to testify. We find this error harmless.

Chima's role in the robbery was documented by the text message exchange between Chima and Rasberry, which was introduced into evidence at trial. The jury saw a print-out of those messages. These messages were certainly incriminatory as to Rasberry and to a lesser extent to McMillian, as it suggested McMillian was in the car with Rasberry. If the jury drew any negative inference from Chima's refusal to testify it would have been that he did not want to confirm that he sent the texts and thereby confirm his role in the crimes. Since the messages were found on a cell phone in Rasberry's possession which Rasberry had used, Chima's testimony would have been largely cumulative. There is no reasonable probability or possibility that appellants would have received a more favorable outcome if Chima had not been put on the stand and the jury had not been permitted to draw a negative inference.

5. Snitch testimony

During the trial of this matter, Williams was in custody in county jail because he was a non-cooperative witness. At one point during trial, the prosecutor asked Williams if he had told fellow inmates that he was not cooperating with the prosecution. Appellants moved for a mistrial on the ground that the prosecutor lacked foundation to ask this question. Rasberry contends the trial court erred in denying that motion and McMillian joins that contention. We do not agree.

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

12

considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) Accordingly, we review a trial court's ruling on a motion for a mistrial under a deferential abuse of discretion standard. (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

Here, the trial court denied the motion for a mistrial because it found the question was supported by the overall state of the evidence. We see no abuse of discretion in the court's ruling.

The evidence showed that, after being robbed, Williams cooperated with police, identified Rasberry as one of the robbers, picked Rasberry's photograph out of a photographic line-up and also picked McMillian out of a photographic line-up. Then, before trial, Williams told police that he wanted to cooperate with them but was afraid to do so because appellants were gang members and Williams had received threats. At trial, Williams claimed not to remember saying anything substantive to police about the robbery and denied that he circled appellants' photos in the line-ups. He also denied telling police before trial that he was afraid to cooperate.

The prosecutor asked Williams if he was afraid to testify "today." Williams denied it. The prosecutor, in an apparent attempt to impeach Williams, asked him if he knew what happened to jail inmates if it became known that they were going to be prosecution witnesses in a case. Williams replied that nothing happened to them. He added that he himself was proof nothing happened because everybody in his jail dorm knew he was a witness in this case and nothing had happened to him.[4] These facts provide a reasonable basis for the prosecutor's questions asking Williams if the reason he had not been harmed was because he had told other inmates that he was going to help the defense and not the prosecution or the police. Thus, the trial court did not abuse its discretion in denying the motion for a mistrial.

---

[4]     Williams was in jail because of his noncooperation, and had to be extracted from his cell to be brought to court. He appeared as witness in handcuffs and a county jail jumpsuit.

13

Even if the questions were not supported by the evidence, appellants have not shown prejudice from the questions. There was overwhelming evidence that Williams was in fact not cooperating with the prosecution. Even if the jury ignored the court's instruction that questions are not evidence, disbelieved Williams's denial, and somehow found that Williams did tell others in jail that he was not going to cooperate with the prosecution, Williams's statement was at most cumulative of the overwhelming evidence of non-cooperation. For that reason as well, the trial court did not abuse its discretion in denying the motion.

6. Gang-related evidence

Appellants contend the trial court erred prejudicially in admitting gang evidence in this case because the gang allegations had been bifurcated from the case, the evidence that the crime was gang-related was weak at best and gang evidence was not necessary to explain Williams's fear of testifying. We do not agree.

A trial court's ruling on the admissibility of gang evidence is reviewed for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 528.)

Evidence of gang affiliation and gang activity is admissible when relevant to an issue in the case. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) Witness intimidation is such an issue. (*Ibid.*) "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

Expert testimony that members of a street gang would intimidate persons who testify against a member of that gang is "sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury." (*People v. Gonzalez, supra,* 38 Cal.4th at p. 945.) "Evidence of possible intimidation would help explain why the witnesses might repudiate earlier truthful statements." (*Id.* at p. 946.)

14

Here, as appellants acknowledge, there was evidence that Williams believed the robbers were gang members. Appellants contend Williams's statement on this topic was "more than enough to show the effect of gang considerations on Williams' attitude." We do not agree.

There was evidence that Williams had stated that he feared retaliation for testifying, and that part of this fear arose from his belief that the robbers were gang members. However, at other times, Williams denied the men who robbed him were gang members, denied he was afraid of retaliation and denied that gangs retaliate against people who testify against them. Thus, evidence that gangs do retaliate was relevant and not cumulative in assessing Williams's credibility.

7. Adoptive admissions by McMillian

Rasberry called McMillian at least twice from jail, and the calls were recorded. McMillian contends his statements to Rasberry were unreliable hearsay, the trial court erred in finding that his responses to Rasberry's statements were adoptive admissions and further erred in admitting the statements. We see no abuse of discretion in the trial court's ruling.

a. Applicable law

A trial court's ruling on the admission of evidence over a hearsay objection is reviewed under the deferential abuse of discretion standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

Generally, an out-of-court statement offered for the truth of the matter stated is hearsay and is not admissible. (Evid. Code, § 1200, subds. (a) & (b).) However, "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221; see also *People v. Jefferson* (2008) 158 Cal.App.4th 830, 842-844 [statements made by defendants to each other in a recorded jail cell conversation were adoptive

15

admissions].) Evidence Code section 1221 "contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence, equivocal or evasive conduct." (*People v. Castille* (2005) 129 Cal.App.4th 863, 876.)

An adoptive admission is properly admitted when "'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .'" (*People v. Castille, supra*, 129 Cal.App.4th at p. 876.) Thus, "[t]here are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in*, the truth of such hearsay statement.' [Citation.]" (*People v. Silva* (1988) 45 Cal.3d 604, 623.)


b.  Recordings

During call 6FQZ5A6L, the following exchange occurred:

"[Appellant Rasberry]: The detectives came and talked to me - that nigger Stinky gave me, you - I seen everything, my nigger - that nigger, he gave you up, he gave me up, he made a statement.  He gave up your gang name and everything; and me too; where we was from; he did the whole - he said we got the car - we gave him that car - we jacked the motherfucker - Stinky told everything, my nigger.

"[Appellant McMillian]: Yeah.

"[Appellant Rasberry]: So be careful, man. You hear me?

"During call 8ENZDA5L, the following exchange occurred:

"[Appellant McMillian]: Who's this? Bro, what's up? Man, what's up?

"[Appellant Rasberry]: Hey, P.T. P.T.

"[Appellant McMillian]: Yeah, man. What's the deal?

"[Appellant Rasberry]: Yeah, I need your help handle business for me man, hear me?

"[Appellant McMillian]: Yeah, man, what's the deal?

"[Appellant Rasberry]: Yeah, they got me on a carjack.

"[Appellant McMillian]: Oh yeah?

"[Appellant Rasberry]: Yeah, you know what I'm talking about.

"[Appellant McMillian]: Yeah."

c.  Analysis

Rasberry's statements in call FQZ5A6L clearly incriminate McMillian in the crimes.  Rasberry said that Stinky said "*we* gave him that car – *we* jacked the motherfucker – Stinky told everything" both repeats Stinky's accusation against Rasberry and McMillian and acknowledges that the accusation is correct.  Thus, Rasberry was in effect accusing McMillian of committing the crimes with him.  McMillian did not deny the accusation or ask what Rasberry or Stinky were talking about or in any way suggest that he was not involved in the crimes.  Rather, he replied, "Yeah."  McMillian's response can be reasonably understood as agreeing to the truth of Rasberry's statements.

The statement in call 8ENZDA5L is somewhat less clear, as Rasberry says "they got me on a carjack," then adds "you know the one I'm talking about."  McMillian replies, "Yeah."  It is reasonable to infer that Rasberry is talking about the Williams carjacking, since McMillian did not ask for clarification as would be expected if there had been more than one carjacking.  From the context of the phone calls as a whole, it is possible to understand Rasberry's statement as indicating that McMillian would know which carjacking Rasberry meant because McMillian was involved, and McMillian's response as an agreement, although that is not the only possible understanding.

17

8.  Cumulative error

Appellants claim the cumulative effect of the errors in this case require reversal. We do not agree.

When an appellant invokes the cumulative error doctrine, "the litmus test is whether [he] received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.)  Any claim of cumulative error must be assessed to determine "if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid*.)

We have found few errors, and none were prejudicial.  Even considering those errors cumulatively, there is no reasonable probability that appellants would have received a more favorable outcome in the absence of the errors.  Appellants received a fair trial.

9.  Section 654

Appellants contend that section 654 barred multiple punishments for their robbery, carjacking and assault convictions, and the trial court erred in imposing sentences on all three counts.  We do not agree.

a.  Applicable law

Section 654 provides in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one. . . ." Thus, section 654 prohibits multiple punishment for multiple offenses arising out of a single indivisible transaction. Whether a course of criminal conduct is divisible depends on the intent and objective of the actor.  (*Neal v. State* (1960) 55 Cal.2d 11, 19.)

The question of whether the acts of which the defendant has been convicted constitute an indivisible course of conduct is primarily a factual determination made by the trial court on the basis of its express or implied findings concerning the defendant's intent and objective in committing the acts.  (*People v. Deloza* (1998) 18 Cal.4th 585,

18

594-599.)  The trial court's determination is reviewed in the light most favorable to the judgment, and will not be reversed on appeal unless unsupported by the evidence presented at trial.  (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

b.  Robbery and carjacking

In imposing separate sentences on Rasberry for all three counts, the trial court stated:  "The court should make it clear that the robbery, the carjacking, and the assault are not intertwined.  A robbery occurred initially.  After the robbery had been completed, the carjacking occurred."

In texts to Rasberry immediately before the robbery, Chima repeatedly stated that Williams would have the $4500 on his person:  "it was in his sock" and "I think it's in his pocket."  Chima also stated that if the money was not on Williams's person as he drove, it was in the car, but "when we get out da car he go have it" and "he go take it out da car b4 he go in da house."  However, when Williams got out of the car at the house, he only had about $200 on his person.  McMillian began to search the car.  Rasberry said to McMillian, "Fuck it, Cuz, let's take the car, just take the car."

The key evidence on appellants' intent is Rasberry's statement to McMillian, "Fuck it, Cuz, let's take the car, just take the car."  The trial court impliedly inferred from this statement that Rasberry was giving up on obtaining any more cash, and formed a new intent to steal the car.  This is a reasonable inference from the evidence.  Chima had indicated that Williams would have the money on his person when he got out of the car, but Williams did not.  Rasberry could have decided that Chima was mistaken about the amount of money Williams had or about Williams bringing the money with him from the

prior location and have given up on robbing Williams.[5] Thus, there is substantial evidence to support the trial court's finding that the robbery was completed before the intent to take the car was formed. (See *People v. McGahuey* (1981) 121 Cal.App.3d 524, 529-530 [separate sentences for burglary and assault committed while leaving were proper because evidence supported inference that intent to commit assault was formed after burglary].)

Rasberry appears to have been the lead robber. He communicated with Chima before the robbery, confronted Williams during the robbery, and appears to have been the one to decide to take the car. There is no evidence that McMillian had any plans of his own to take the car. Thus, it is reasonable to infer that he formed the intent to take Williams's car when he heard Rasberry suggest it. As we have just discussed, that occurred after the robbery was complete.

c. Assault

The trial court stated the assault "was separate and distinct from what was necessary to carry out both the robbery and the carjacking." The evidence supports an inference that the assault took place after Williams had handed over the money in his pocket. Further, the evidence supports an inference that the keys were in the car readily accessible to appellants and thus violence was not needed to obtain possession of the car.

_____

[5] It would also be reasonable to infer that appellants took the car in order to search it at their leisure for the cash. This is essentially the theory the prosecutor advanced in closing argument and the theory appellants advance on appeal. This inference would not permit separate sentences. "[I]f all of the offenses were merely incidental to or *were the means of accomplished or facilitating one objective*, defendant may be found to have harbored a single intent and therefore may only be punished once." (See *People v. Le* (2006) 136 Cal.App.4th 925, 931 [defendant stole goods in a store burglary, then stole store manager's vehicle in order to depart with stolen goods] (italics added).) However, this alternate inference does not require reversal since "if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

Thus, there is substantial evidence to support the trial court's finding that the assault was a separate act of violence. (See *People v. Nguyen* (1988) 204 Cal.App.3d 181, 190-193; *In re Jesse F.* (1982) 137 Cal.App.3d 164, 171.)

9. Presentence custody credit

Rasberry contends the trial court erred in failing to award him good time/work time local conduct credit. Respondent agrees, but contends the trial court also erred in calculating the number of actual days Rasberry spent in custody. We agree with respondent.

A trial court's failure to award the correct amount of presentence custody credit is a jurisdictional defect that is subject to correction at any time. (See *People v. Taylor* (2004) 119 Cal.App.4th 628, 647; *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

The court awarded Rasberry 614 days of actual custody credit. Rasberry was arrested on October 5, 2011 and sentenced on May 13, 2013. This totals 587 days.[6] (See § 2900.5, subd. (a).)

As Rasberry acknowledges, he was convicted of multiple violent felonies and so is limited to 15 percent of local conduct credit. (§§ 2933.1, subd. (a); 667.5, subds. (c)(5), (c)(17) & (c)(22).) Fifteen percent of 587 is 88. The total credit amounts to 675 days. We order the abstract of judgment corrected to reflect these totals.

10. Concurrent sentences

Appellant Rasberry contends the trial court erroneously believed it lacked discretion to impose concurrent terms for the carjacking, robbery and assault terms. Respondent contends, and we agree, that appellant has forfeited this claim by failing to raise it in the trial court. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751; *People v. Scott* (1994) 9 Cal.4th 331, 353-354.)

---

[6] This total consists of 88 for the period from October 5 2011 through December 31, 2011, 366 days for 2012 and 133 days for the period from January 1, 2013 through May 13, 2013.

21

Assuming the claim were not forfeited, we would find the record does not show error. There is no discussion by the parties or the court concerning whether sentence should be imposed consecutively or concurrently. Rasberry is correct that the court stated that it its "discretion as to the allegations and charges are essentially non-existent" and that it was required to "impose the sentenced the law requires" but nothing in the context of that remark suggests the court was referring to consecutive sentencing. Soon thereafter, the court stated "the court is obligated pursuant to the finding by the jurors as to 12022.53, the court imposes an additional 10 years." Thus, in context, the court's remarks about its limited discretion appear to refer to the length of the sentence for each count, not to whether the counts were sentenced consecutively.

Disposition

Appellant Rasberry's custody credits are ordered corrected to 587 days of actual custody and 88 days of custody credit, for a total of 675 days. The clerk of the superior court is instructed to prepare an amended abstract of judgment reflecting these corrections and to serve a copy on the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.

NOT TO PUBLISHED IN THE OFFICIAL REPORTS.


MINK, J.[*]


We concur:


TURNER, P. J.


KRIEGLER, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22